Filed 8/29/25  P. v. Austin CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY AUSTIN,<br><br>    Defendant and Appellant. | D082809<br><br><br>(Super. Ct. No. SCD294001) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed as modified.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Robin Urbanski, Supervising Deputy Attorney General and Anastasia Sagorsky, Deputy Attorney General for Plaintiff and Respondent.

On August 30, 2021, Anthony Austin drove a red SUV up to a vehicle in which Arthur Williams was sleeping, pulled out a gun and shot Williams, who eventually died from the gunshot wound. Austin and Williams were from two different subsets of the Neighborhood Crips, a criminal street gang. Evidence showed that days before Williams's shooting, animosity arose between the subsets after a member that Williams mentored was involved in the murder of another subset member close to Austin. A jury convicted Austin of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found true allegations that he personally discharged a firearm causing death (§ 12022.53, subd. (d)) and that the murder was perpetrated by firing from a motor vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)). The court dismissed the section 12022.53, subdivision (d) firearm enhancement and sentenced Austin to life in prison without the possibility of parole. It imposed a $300 restitution fine under section 1202.4, subdivision (b), and suspended a $300 parole revocation fine under section 1202.45.

Austin contends the court prejudicially erred by admitting gang-related evidence because it was minimally relevant to the issues, including as to motive, context, intent and identity, and more prejudicial than probative. He maintains the error rendered his trial fundamentally unfair in violation of his Fifth Amendment due process rights. Austin further contends the section 1202.45 parole revocation fine is unauthorized and must be stricken. The People correctly concede the latter point. We modify the judgment to strike that fine, but otherwise affirm.

---

[1] Undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

*Williams's Shooting and Andre Carroll's Murder Five Days Earlier*

Witnesses saw Austin drive up in a red Ford Explorer to Williams's vehicle and shoot Williams. One such witness was Williams's sister, S.J., who that morning was at a park where she spent time with friends every day. Williams had arrived to the park that morning after work, but ended up taking a nap in his car. S.J.'s family and Austin's family were close friends, and had known each other for years. According to S.J., earlier in the month before the shooting, she answered her brother's phone and heard Austin, who she knew as "Bone," on the other end say in an unfriendly tone, "A-Rocc you can get it too cuz," and hung up. Williams's street name or moniker was A-Rocc. S.J. told her brother it was Bone who called.

When S.J. saw the red SUV pull up, she walked toward it and from about 12 feet away, saw Austin raise his head up from the driver's seat, give her a "cold[ ] look" then drive to her brother's car and started shooting. Before the shooting, S.J. did not have personal problems with Austin. She had no doubt in her mind that Austin shot her brother.

Another witness, J.W., was at the park that morning. J.W. had a close relationship with Williams; he considered him like an uncle and loved him. Williams was J.W.'s mentor in the Neighborhood Crips, a gang in the neighborhood of 47th and Market Street, including 41st Street. According to J.W., he and Austin were from the same "hood," but Austin was from the 41st Street subset of Neighborhood Crips, and J.W. and Williams were from the 47th Street subset of the same gang.

J.W. went up to Williams's car to talk, and Williams told J.W. he was anxious. J.W. saw that Williams had bags under his eyes and appeared that he had not slept a few days. Williams also had a gun in his seat, which was

3

abnormal. Williams told J.W. to look out for him so he could sleep. J.W. returned to a basketball court where he had been earlier, saw Austin pull up, park for about five seconds, speak out to Williams, then fire six times. J.W. described Austin as wearing a black stocking cap over his long hair, which had beads. J.W. immediately ran to the car and put his hand on Williams's neck to try to stop the bleeding. Williams told J.W. to take his gun away, so J.W. grabbed the gun and his backpack and ran down an alley to put it in some bushes. J.W. knew police were going to come, and because they were both gang members he was afraid of them getting in trouble for having the gun. Also, because Williams was his "homey," J.W. would to anything Williams told him to do.[2]

D.M., a phlebotomist with some life support training, was in her car across the street when she saw the red SUV pull up, someone stick their arm out the passenger window and shoot. The red SUV then sped away. She went to help and asked someone to put pressure on Williams's neck wound, then she found a towel and put it on his neck. D.M. asked Williams if he knew who had done this, and he muttered something that sounded like "Bo." D.M. later told police that she believed she saw two black individuals in the red SUV, including a large, older man.

An unidentified man called 911 to report the shooting. He reported seeing the red SUV and a man shot in the neck bleeding heavily. While on the call, the man spoke with a woman who stated the red car was a Ford Explorer, and that the person in it was "Little Bone [or] Baby Bone . . . from Raven Street."

---

[2] At the time of trial, J.W. was in custody for an unrelated robbery and assault with a firearm.

4

The red Ford Explorer was owned by S.E., Austin's girlfriend's aunt, who lived on Mohawk Street in La Mesa. Data from Austin's cell phone call detail records indicated that on the morning of the shooting his phone was in the vicinity of Mohawk Street then could have been at the park from 9:47 a.m. to 12:11 p.m. The records showed the phone moving away from the park afterwards. His cell phone communications with the network ended after 1:54 p.m. In a recorded jail call, Austin mentioned that he had broken a cell phone "because there was too much stuff on it." Police found a broken cell phone inside a bathroom vanity during a search of Austin's home.

Five days before William's shooting, police began working up a case in which Chantell Tompkins ("Tiny Crip Sticc," a 4-7 member) was charged with the murder of Andre Carroll ("Baby Sed Dogg," a 4-1 member).

*Pretrial Motions and Court's Ruling re Admission of Gang Evidence*

Before trial, the court addressed the parties' respective motions on the admission of gang-related evidence. Initially, the People moved to admit testimony from a gang expert about a feud within the Neighborhood Crips gang, specifically resulting from the murder of Carroll by Tompkins, which assertedly triggered Williams's murder by Austin in retaliation. In supplemental briefing, the People clarified that they wanted to give the jury "context into the gang world which is unfamiliar to most ordinary everyday citizens and to show evidence of motive[,] intent and identity," and thus sought to introduce testimony on the existence, subsets and territory of the Neighborhood Crips criminal street gang as well as expert opinion on the gang membership, associations and tattoos of Tompkins, Carroll, Austin and Williams; culture and habits of Neighborhood Crips gang members; and the interpretation of certain language, statements and actions.

5

The court acknowledged the People did not have a gang enhancement allegation, and that new rules applied concerning the admission of such evidence. After a lengthy discussion in which the court expressed its concern over *Sanchez* issues[3] as well as the state of the law, the prosecutor explained that Austin had made statements about his gang membership and the reason for the murder; S.J. and J.W. would testify about what they know about the Neighborhood Crips gang, its 4-1 and 4-7 subsets, and what was going on within membership at the time; and the expert would testify generally about the gang and its neighborhoods, then give an opinion as to what was happening between the subsets, and that Austin was a member of 4-1.

The court stated: [I]f all [the expert is] saying is, 'it's a neighborhood street gang, I've worked gangs, here's the territory and there are these different sects and they are identified. . . . [H]e's worked this Crip gang and he can say, 'There are these sects.' That's fine. And then you tie it in with defendant's actual statements about this, which are admissible, they are admissions. So that would come in. [¶] If other witnesses can say anything about that, . . . I don't know the foundation for their statements. But assuming they had sufficient foundation that they've discussed with him, for example, . . . it could come in, all of that."

Defense counsel stated her belief that S.J. and J.W.'s testimony would be based on hearsay, lack foundation, and amount to speculation. The prosecutor stated both witnesses were at the time "very closely connected" to the gang, but agreed it would depend on the foundation they could lay. The

---

3    *People v. Sanchez* (2016) 63 Cal.4th 665, 670, 686 [when an expert relates case-specific out-of-court statements and treats them as true and accurate to support his or her opinion, the statements constitute inadmissible hearsay and testimonial hearsay absent unavailability or prior opportunity for cross-examination]; see also *People v. Barnes* (2024) 107 Cal.App.5th 560, 588.)

6

court agreed: "Right. And you don't know how cooperative either or both of them will be. So this is . . . a dynamic case. We don't know." After the prosecutor pointed out Williams and Austin both had tattoos reflective of the Neighborhood Crips gang and its subsets; the court responded: "That's different. I would allow that evidence. That is evidence that directly ties into the victim and defendant." The court reiterated that if the witnesses had sufficient foundation for their gang-related testimony and defense counsel could cross-examine them, it was "a different ball game."

The following day, defense counsel advised the court that the prosecutor had provided an audio-recorded interview with S.J. Defense counsel asked for an offer of proof. The prosecutor explained that S.J. had gone "back and forth" as to whether the matter involved an internal gang dispute or whether it was personal. He pointed out that J.W. had stated Williams's homicide was based on Carroll's murder by Tompkins, and the personal connections between Austin and Carroll on the one hand, and Williams and Tompkins on the other. The prosecution's theory was that Austin's motive was retaliation for the previous murder.

The prosecutor ultimately explained that the "gang is still very much entwined in this case," so his plan was to "generally introduce the sect, and then have the witnesses come in and do specifics. And if I can get those specifics, to have an expert come at the end to explain what . . . the witnesses said on the stand. If they don't say that, then that expert doesn't come in, obviously. [¶] So in opening, I do not intend to go into 'This is 4-1 versus 4-7.' This is a personal beef. I'm going to say, 'This is a disagreement within Neighborhood Crips,' and then I'm going to leave it there, and I will not describe it further than that." The court responded: "Okay. That's appropriate. That's fine. . . . [T]rials being dynamic, we will adjust."

*Gang-Related Evidence*

Before the parties presented witnesses, the prosecutor confirmed with the court that J.W. would in fact testify Austin was a 4-1 member, and that the impetus for the homicide was Carroll's murder. The prosecutor explained he would be calling a detective to lay a foundation for homicide investigations, generally about the Neighborhood Crips gang and its areas, and how gang homicides differ from other homicides. He also explained how J.W. had foundation for his testimony, which was to establish there was an argument between the two Neighborhood Crips subsets to use as circumstantial evidence of the reason for Williams's killing. The court allowed it conditioned on a proper foundation.

Detective Sergeant Christopher Leahy testified that the Neighborhood Crips criminal street gang was a large, very active gang set in San Diego. They claimed territory between the Interstate 15 and Euclid, and the highway 94 to the North to 36th and Imperial to the South. The Neighborhood Crips gang had generational or geographical subsets: one clique or subset grew up along the 41st Street corridor, and another along 47th Street, which was a very large clique. The detective testified that Raven Street was right around the corner from 41st Street, and the park where Williams was shot was located near 41st Street.

Detective Leahy explained that the numbers 4-1 and 4-7 were significant to the Neighborhood Crips, as was the glove of the Milwaukee

8

Brewers baseball team, which signified 40's.[4] The gang's primary color was blue. The detective testified that gang homicides were different from other types of homicides in that they were the most difficult to work and solve. Oftentimes there was no motive: members could drive in a rival territory for no reason and target or shoot people that they assume were rivals. He testified that witnesses were ordinarily not cooperative; the majority would not talk to them, especially at the crime scene, but it was possible to get people to speak "offline" who were tired of the things happening in their neighborhood. He explained there were logical reasons why individuals did not want to get involved; they did not want their house set on fire or shot at, or their children intimidated. It was very difficult and rare for a gang member to come forward to testify in an investigation. He had worked cases where witnesses were killed.

Defense counsel conducted a lengthy cross-examination of Detective Leahy. She asked the detective to further describe the difference between the Neighborhood Crips and the other crip gang, the West Coast Crips, and their territories. She asked whether gang members could live in areas outside their territory, and whether the West Coast Crips and Neighborhood Crips would feud. The detective explained that the Crip gangs would almost never feud as they were aligned and closely connected, but "just like in any large organization you're going to have tiffs happen because you have so many people involved," and that with most gang members "it's all about respect."

---

[4] Detective Leahy also offered without prompting that the number 211 represented February 11, and the letters "B" and "K," which stood for "Blood Killer." He stated, "So when people put [211] on themselves, they're pretty much saying, you know, that they've done on something [*sic*] or are perhaps willing to do something violent to a rival." The prosecutor steered the detective to another question, even though the detective said he had not finished his explanation.

"So if you feel disrespected or dissed, somebody took your girl, somebody made a social media post you don't care for, even though you're Crips, or even though you're Neighborhood Crips, that can set off a fire." He explained many gang members did not have the emotional intelligence to work through conflict, so as a gang member they were "expected to pop off," get in a fistfight or maybe pull out a gun and shoot the other individual. He had never seen a West Coast Crip transfer to a Neighborhood Crips gang based on a move or change in influences. When defense counsel asked the detective to name other subsets or cliques of the Neighborhood Crips, he mentioned the 41st and 47th, as well as "Young Reckless Mafia" who were "really bad guys" as well as 211 for BK, Glove Gang, and Young Original Crips. Defense counsel elicited information from the detective about why gang members were more violent than the average person and why gang members would shoot rival gang members for no reason. He confirmed the gang rival shootings were the hardest cases to work on and solve.

J.W. testified about the different groups within the Neighborhood Crips, including the groups from 41st and 47th Street, who intermingled with each other. He stated that in normal times, the Neighborhood Crips subgroups got along well. He testified that Tompkins, who he knew as "Tiny Sticc," was from 47th Street and his given name was Chantell. J.W. had known Tompkins since they were in elementary school. Williams was also a mentor to Tompkins. J.W. understood that Carroll (who J.W. only knew as "Baby Sed Dogg") and Austin were close, like family in some way, and referred to each other as "brother." J.W. did not know Carroll personally since they did not grow up in the same clique. J.W. identified photographs of Williams's tattoos and explained their meaning, including one reading "Original Little Crip," 4 Seven, and a glove symbolizing "40 Crip" with the

numbers 4-1 and 4-7 on either side, meaning Williams associated with both blocks.

J.W. and Williams were both present at a meeting between the 4-1 and 4-7 Neighborhood Crips subsets, which was called due to the animosity that arose between them after Carroll's shooting. The meeting, which J.W. said occurred a couple of weeks before Williams's shooting, was to air out what was happening and dispel some of the animosity. According to J.W., "[t]here were threats floating around between certain individuals of 41st Street and 47th Street. So we were kind of like trying to kill the . . . beef so nothing else would happen further."

After Austin's girlfriend disrupted the courtroom and was removed, J.W. testified that when officers began questioning him at the scene, he was worried about answering questions. Asked to explain, he said: "For the same reason that that girl that just walked in here right now, calling me a snitch. The whole hood is saying the same thing, and I don't care because at this point, the truth got to come out." He explained that in his neighborhood, people were not supposed to report things that happened even if it was between the same gang members and it bothered them. The consequence of talking to police or testifying in court was that if he did not remain silent, "I'd be dead." J.W. testified that he wanted the killing to stop, and he no longer associated with the gang.

J.W. described what normally happens when a killing occurs in gang culture. Rather than going to police, there was "one of two things: either it can get handled in-house and they could dispatch the person, or they excommunicate him, tell him to get away and don't come back." Dispatching meant killing the person. But when another gang takes the life of a Neighborhood Crips member, that was an "easier equation. Like when

11

there's—when it's your own homies, you don't know what to do. You don't know. . . you sit there. You try to figure things out. You've got to have meetings. There's protocols to everything. [¶] But when there's another gang, then you just take your violence out on that gang. It don't matter. It's impersonal. It's not about one person. It's just about you feeling better at the end of the day about what happened to that person." J.W. confirmed the latter situation was known as a "get-back."

*Defense Evidence*

The defense presented evidence from various investigators who had received prior inconsistent statements from S.J. and J.W. about the events surrounding Williams's shooting.[5]

Austin testified on his own behalf. He denied driving the red Ford Explorer on the day of the incident, explaining the car belonged to his girlfriend's uncle's wife, S.E. Austin admitted driving the car earlier in the month to do S.E. some favors. He explained he became involved with gangs as an early teenager because most of his family had gang ties. Austin had tattoos, including the numbers 41 and 47, reflecting his association with the Neighborhood Crips. He did not consider himself within any particular Neighborhood Crips subgroup or "clique," though some individuals who were

---

[5]    J.W. admitted that to protect Williams, he initially lied to police, telling an officer he had removed a large knife, not a gun, from Williams's car. He also admitted lying to police by telling them he had fired his gun multiple times at the Explorer; he explained he wanted to "mislead" them because he did not want to talk about it. He made misrepresentations or "threw in" certain facts for those reasons. Having been a gang member since age nine, he was uncomfortable speaking with police and in that life it was "natural to give inconsistencies or . . . tell outright lies . . . ." He explained that shooting at the Explorer was something he was "supposed" to do, and it "gave [him] weight for [him]self." In gang life, it was common to tell lies to protect someone or something, it was part of "gang life culture."

from a specific street or location tended to identify with the gang's subgroups. Austin sold drugs for the gang and had been incarcerated multiple times, about 80 percent of his life. He otherwise held odd jobs. When he was not in jail, he lived on Raven Street with his spouse. Austin sometimes carried a gun to avoid getting robbed during large drug purchases.

Austin knew Williams from the neighborhood; they were not friends. Williams was another Neighborhood Crips member who identified with 47th street. Austin also knew of Tompkins and Carroll from the neighborhood, but had no relationship with them. He heard that Tompkins had shot Carroll, but he was not involved and did not know anything more about it; those men were in a younger generation and he did not mingle with them.

On the day of the shooting, Austin was at home with his children. He heard about the shooting later that night or the next day, when people started saying he had shot somebody at the park. He went ahead and bought a firearm as well as a new cell phone so that police would not be able to see his connections and transactions. When police arrested him, they found the gun, which was a .357-caliber Magnum.

Austin admitted that after his arrest while in a holding cell, he made the following statement to another inmate: "No, I'm saying I popped on him. He tried to cut my Explorer up, and he's like my cousin. He used to be from Skyline. I put the n[****] on. Homies winding him up. Boom, boom, boom, boom, boom, because it's a big 4-1 / 4-7 thing going on, but you from 4-1 like me." Austin also made statements indicating knowledge about the shooting, including the use of a red car and that police did not have any shell casings. He tried to explain his statements were made because he was from both the 4-1 and 4-7, and was repeating rumor and hearsay from the neighborhood.

13

*Closing Arguments*

The prosecutor began his closing argument by attributing Austin's actions on the day of the shooting, to the "Neighborhood Crip code," stating: "Violence begets violence, a life for a life. That's the code. That's the gang code. That's the Neighborhood Crip code. That's the code that Anthony Austin followed on August 30th, 2021 . . . ." He explained that J.W. had told the jury Austin's motive stemmed from Tompkins's murder of Carroll, who was like a brother to Austin. The prosecutor pointed out that while Austin had "41" tattooed on his wrist, he tried to distance himself from the subset, since, "If he's not 4-1, then he doesn't have a motive."

## DISCUSSION

### I. *Admission of Gang-Related Evidence*

Austin contends the court prejudicially erred by permitting the jury to hear what he describes as extensive testimony regarding gang rivalry, rules and gang life in his case, where the People did not charge gang-related substantive offenses or enhancements or allege any gang rivalry, and he and Williams were in the same gang. Though Austin recognizes gang-affiliation and activity evidence can be introduced to show motive or intent and in such cases its probative value "generally exceeds its prejudicial effect," he maintains the evidence in this case should have been excluded under Evidence Code section 352 because it was minimally relevant to the issues of motive, context, intent, identity or other reasons, and was thus more prejudicial than probative. Austin points out the prosecutor changed his rationale for admitting the evidence during trial, and never presented evidence that the Neighborhood Crips was in fact a criminal street gang. According to Austin, the only logical relevance of the evidence was to show he had a bad character: he was a violent man who belonged to an organization

14

that promoted and condoned violence.  He argues the fact S.J. and J.W. gave different versions of the shooting, combined with evidence that there was more than one person in the red SUV, make it reasonably probable that absent the inadmissible gang evidence, at least one juror would have found the evidence insufficient for first degree murder.

A.  *Standard of Review*

We review the trial court's evidentiary rulings under Evidence Code section 352 for abuse of discretion.  (*People v. Hin* (2025) 17 Cal.5th 401, 476; *People v. Chhoun* (2021) 11 Cal.5th 1, 26.)  " 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328-1329.)

B.  *Legal Principles*

In 2021, the Legislature amended section 186.22 by imposing new substantive requirements relating to gang enhancements and the criminal offense of gang participation.  (*People v. Burgos* (2024) 16 Cal.5th 1, 7; Assem. Bill No. 333 (2021-2022 Reg. Sess.) Stats. 2021, ch. 699, § 1.)  It also added section 1109, which provides that a trial court must try a gang enhancement charge separately from the underlying offense, upon defense request.  (*Burgos*, at p. 7; § 1109, subd. (a).)  In doing so, the Legislature found that gang evidence " 'can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people.' "  (*Burgos*, at p. 10.)

15

But, this court has observed, "section 1109 does not disturb existing case law holding that gang evidence may be admitted to prove substantive crimes." (*People v. Garcia* (2024) 107 Cal.App.5th 1040, 1049; accord, *People v. Hinojos* (2025) 110 Cal.App.5th 524, 549.) "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun, supra,* 11 Cal.5th at p. 31; accord, *People v. Burgos, supra,* 16 Cal.5th at p. 23 ["in some instances, the same gang evidence introduced to establish the elements of a gang enhancement might be admissible at a bifurcated trial on the underlying charge"].)[6]

Indeed, "[a]lthough evidence of gang membership carries the potential for prejudice, it ' "is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772; accord, *People v. Ramirez* (2022) 13 Cal.5th 997, 1095 [gang evidence "is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect"].)

Even if relevant, "[c]ourts must ' "carefully scrutinize[ ]" ' " gang-related evidence because such evidence " ' "creates a risk the jury will improperly

---

6    " 'Except as otherwise provided by statute, all relevant evidence is admissible.' [Citation.] Relevant evidence is that which has 'any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " (*People v. Lamb* (2024) 16 Cal.5th 400, 423, quoting Evid. Code, §§ 210, 351.)

infer the defendant has a criminal disposition" ' and is therefore guilty of the offense charged." (*People v. Hin, supra,* 17 Cal.5th at p. 476; *People v. Chhoun*, *supra*, 11 Cal.5th at p. 31.)  Nevertheless, " ' " ' "prejudicial" is not synonymous with "damaging." ' "  [Citation.]  " ' "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case." ' "  [Citation.] The "prejudice" which section 352 seeks to avoid is that which " ' "uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*." ' " ' "  (*Chhoun*, at p. 29; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 363.)  We will reverse the court's admissibility determinations "if the probative value of the evidence ' "clearly is outweighed by [its] prejudicial effect." ' "  (*Hin*, at p. 476.)

In *People v. Chhoun*, *supra*, 11 Cal.5th 1, the California Supreme Court found no abuse of discretion or constitutional violation in admitting evidence of defendant's membership in an Asian gang, as well as a gang expert's opinions generally on Asian gangs' organization, their differences from other types of gangs, use of firearms and typical practice of committing home invasion robberies.  (*Id*. at p. 30.)  A jury convicted defendant of murder, among other crimes, and found true a special circumstance allegation of murder during a burglary after he and other gang members participated in a home invasion robbery during which he killed five members of a Vietnamese family, and shot the sixth member, a three-year-old child, in the hand.  (*Id*. at pp. 11-14.)  One parent had superficial cuts and another had toothpaste smeared around her face.  (*Id*. at pp. 13-14.)  After the court gave limiting instructions to the jury (that the expert was called for a limited purpose and evidence of defendants' gang membership "may not be considered by you to prove that [defendants] are persons of bad character or that they have a disposition to commit crimes," *id*. at pp. 30-31), the expert testified that home

invasion robberies were a hallmark of Asian street gangs, who frequently targeted Asian families for their jewelry, and used guns to terrorize their victims. (*Id.* at pp. 16, 30.) He testified the gang members would typically torture or harm the most vulnerable victims, the oldest or youngest family member, or fire a nonfatal shot to elicit compliance. (*Id.*, at pp. 30, 32-33.) The expert described incidents where gang members hung a two-year-old by his ankles out a second story window, dunked a one-year-old child's head in the toilet, and poured a pan of boiling water over a 79-year-old grandmother. (*Id.* at p. 33.)

The defendant contended the evidence was not relevant to any disputed issue in part because his intent to kill and motive of financial gain was apparent from the manner of the crimes, which he argued were not gang-related. (*People v. Chhoun, supra,* 11 Cal.5th at p. 31.) The California Supreme Court rejected the argument. Because the defendant's not guilty plea disputed all elements of the crimes, evidence of the gang membership was relevant to show his relationship with his accomplices who testified against him, as well as his identity as one of the robbers. (*Id.* at p. 31.) It tended to show his intent to steal and kill if necessary, and illuminated the evidence of plan or scheme by which Asian gangs committed such crimes. (*Id.* at p. 32.) The court explained that intent to kill was a disputed issue for both the murder charge and the special circumstance allegations; "[w]hile not itself an element of the crimes, motive can illuminate intent" and " ' " [b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' " ' " (*Ibid.*)

The court also rejected defendant's argument that the evidence as to Asian gangs generally was overbroad, inflammatory and unduly prejudicial.

(*People v. Chhoun*, *supra*, 11 Cal.5th at p. 31.)  Pointing out the expert also testified about the defendant's gang in particular, the court explained the defendant was "free to highlight any overgeneralizations on cross-examination" and did so.  (*Id*. at p. 33.)  It explained the incidents were relevant to explain nonfatal wounds on the family members in the defendant's crimes, and illuminated the gang's modus operandi and explained the motive for the nonfatal gunshots, superficial cuts, and smeared toothpaste.  (*Ibid*.)  Because that testimony was brief, it was not more inflammatory than the torture and murder of the family killed by defendant. (*Ibid*.)  Finally, the court concluded the evidence's probative value was not substantially outweighed by the risk of undue prejudice.  (*Ibid*.)  The trial court had carefully weighed the evidence's probative value against its potential for undue prejudice, took steps to minimize the expert's subject areas, and gave the limiting instruction that the evidence could not be used as proof of defendant's character.  (*Ibid*.)

This court in *People v. Garcia*, *supra*, 107 Cal.App.5th 1040, on the other hand, held the admission of a gang-related evidence was prejudicial error in a case involving a murder that occurred during a robbery committed in the course of a gun sale transaction.  The defendants, both Logan gang members, were charged with murder with allegations of a robbery murder special circumstance, attempted murder and robbery, after they robbed two individuals, killing one.  (*Id*. at pp. 1044, 1045-1046.)  During a jail undercover operation, one of the defendants stated the other defendant he was with " 'messed up,' the incident was not gang-related or involve[d] gang enemies, and 'was supposed to be just a robbery.' "  (*Id*. at pp. 1047, 1051.) Nevertheless, the court allowed the People to present evidence of the gang's violent nature, engagement in illegal activities, and the defendants' gang

19

tattoos as relevant to intent, motive, conspiracy and aiding and abetting. (*Id.* at p. 1048.)

This ruling was an abuse of discretion under Evidence Code section 352 that led to a miscarriage of justice. (*People v. Garcia, supra,* 107 Cal.App.5th at pp. 1051, 1059.) "No admissible evidence existed showing the crimes had any connection to the Logan gang" and the evidence "was either cumulative of other admissible evidence or not relevant to proving the substantive crimes." (*Ibid.*) There were no gang signs thrown and no gang threats, and the incident did not occur on gang territory. (*Ibid.*) The defendant's undercover exchange revealed he "denied *any* gang purpose, including no purpose relating to a Logan gang enemy." (*Id.* at pp. 1051-1052.) The People argued the gang evidence was relevant to defendants' intent to rob the murder victim, but gave no analysis as to how the evidence proved intent, and this court concluded gang evidence was unnecessary in any event because the defendant during the undercover operation admitted he and his codefendant were together to commit a robbery. (*Id.* at p. 1052.)

Further, other circumstantial evidence showed the existence of a conspiracy and aiding and abetting without the need to refer to gang-related evidence. (*People v. Garcia, supra,* 107 Cal.App.5th at p. 1053.) "[A]bundant evidence," including social media posts and cell phone message streams, showed the defendants' relationship with each other and their planning and participation in the robbery. (*Ibid.*) Nor was the gang evidence needed to prove the defendant was a major participant in the robbery, which was established by other evidence—including phone messages planning the robbery and communicating with the victim concerning the gun sale— unrelated to the Logan gang. (*Id.* at p. 1054.)

Under these circumstances, this court held the probative value of the evidence was de minimis and substantially outweighed by a probability that admitting it would unduly prejudice the defendants, who the jury was told were extremely dangerous members of the Logan gang, whose purpose was to frequently commit crimes together and obtain status within the gang by killing. (*People v. Garcia*, *supra*, 107 Cal.App.5th at p. 1058.) The evidence "evoke[d] an emotional bias and had no evidentiary value in proving the substantive crimes" and the prosecutor used the evidence extensively in closing argument by portraying defendants as violent gangsters. (*Id*. at p. 1059.) On the record, there was an equal balance of reasonable probabilities as to leave serious doubt whether the error affected the result; for purposes of prejudice review under *People v. Watson* (1956) 46 Cal.2d 818, 836, a hung jury was more favorable than a guilty verdict. (*Ibid*.)

We reached a similar conclusion in *People v. Huynh* (2021) 65 Cal.App.5th 969, in which the defendant was convicted of murder by means of discharging a firearm from a moving vehicle. (*Id*. at p. 972.) The People did not bring any gang allegations. (*Id*. at p. 982.) In *Huynh*, a gang expert testified that the defendant was not a documented member of a criminal street gang, nor was the victim, and defendant was not an associate (a person who engaged in crimes and spent time with gang members) either. (*Id*. at p. 976.) But the prosecution argued defendant was a member of Thien Dang, "an older group of guys who hang out and commit crime." (*Id*. at p. 980.)

We reversed: "Here, there was no evidence that Thien Dang was a criminal street gang; nor was there any evidence that committing crimes was one of its primary activities or that any of its members had committed any crimes, with the exception of defendant's crimes at issue here. Rather, the evidence established that Thien Dang was a place or a group of Vietnamese

21

men who gathered to socialize and drink.  Merely because [another individual], when prompted by an interpreter, at one point stated Thien Dang was a criminal street gang did not make it so.  Yet, throughout the trial Thien Dang was treated as a criminal street gang.  And, . . . the prosecutor without foundation continually attributed the culture and habits of members of a criminal street gang to defendant." (*People v. Huynh*, *supra*, 65 Cal.App.5th at p. 982.)  We observed further that the People charged no gang allegations, "making the risk of injecting undue prejudice particularly high." (*Ibid*.)  And we noted the crimes bore little indicia of typical gang crimes, the fights preceding the murder did not include any signs of gang rivalry, and the defendant and his group aligned with him were not gang members.  (*Ibid*.) "No gang colors, signs, shouts, or announcements were reported.  There was no dispute over territory.  Tagging was not mentioned.  The victim was not a gang member, although he was friendly with a group of gang members and he was driving a gang member's car on the night of the murder." (*Ibid*.)

Without the "fundamental link" of Thien Dang being a criminal street gang, the defendant's membership was not relevant to his motive or intent, but rather "the evidence was inflammatory by implying to the jury that defendant had a disposition or character for using overwhelming violence in retaliation for disrespect, with no foundational support." (*People v. Huynh*, *supra*, 65 Cal.App.5th at p. 983.)  And the error was prejudicial in part because the gang expert was permitted to testify that all Asian gangs were extremely violent, "tagg[ing] the defendant with the character or disposition for using overwhelming violence in retaliation for disrespectful actions, with no basis in fact." (*Id*. at p. 986.)

C. *Analysis*

This case lies closer to *People v. Chhoun, supra,* 11 Cal.5th 1 than *People v. Garcia, supra,* 107 Cal.App.5th 1040 and *People v. Huynh, supra,* 65 Cal.App.5th 969. We recognize that with numerous eyewitnesses to the shooting, including S.J. and J.W., who personally knew Austin and were able to identify him as the shooter, as well as cell phone data that circumstantially placed Austin both at S.E.'s house then at the crime scene, evidence of Austin's and Williams's gang membership—with its potentially inflammatory impact—was arguably of "tangential[ ]" (*People v. Garcia*, at p. 1049) relevance to Austin's guilt of the charged offenses. And while the court instructed the jury with the standard limiting instruction, CALCRIM No. 303 ("During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other"), there is no indication either the court or counsel in closing arguments identified further which evidence the jury was required to consider in a limited manner. *Chhoun* stated an instruction explaining the limited purpose for which gang evidence has been admitted, such as CALCRIM No. 1403, is "advisable" in these situations. (*People v. Chhoun*, at p. 34, fn. 15.) Austin in his reply brief points out such an instruction was "most certainly appropriate." Yet, as *Chhoun* also acknowledged, "[i]f [Austin] believed a more extensive instruction was needed, it was his burden to request one." (*Id*. at p. 33.)

Despite these concerns, we cannot say the court manifestly erred in admitting the evidence of the Neighborhood Crips gang and its subsets, as well as Williams's and Austin's affiliations and membership. The evidence was more than "minimally relevant" to motive, intent, and identity. " ' "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or

23

motive.' " ' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1058.) Austin directly put identity at issue by denying his presence at the scene. Evidence of the animosity between subsets after Tompkins shot Carroll, and the relative affiliations of Tompkins and Carroll, as well as Austin's relationship with Carroll as close 4-1 members, tended to prove that Austin's motive and intent in shooting Williams, who was Tompkins's mentor, was retaliation for Carroll's murder. As in *People v. Chhoun*, *supra*, 11 Cal.5th 1, Austin's intent was in dispute with regard to both malice aforethought on the substantive murder charge and the special circumstance allegation, which required the People prove Austin's intent to shoot at a person from his motor vehicle and intent to kill. We reiterate that *Chhoun* explains motive can illuminate intent and because it is ordinarily the incentive for criminal behavior, the probative value of motive " ' " 'generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' " ' " (*Id.* at p. 32.) That is the case here.

Further, evidence about the Neighborhood Crips subsets and the animosity that arose due to Carroll's murder was highly relevant to the accuracy of J.W.'s identification of Austin as the shooter and his credibility as a witness. (Accord, *People v. Benson* (2025) 110 Cal.App.5th 1068, 1079-1080.) It provided an explanation for J.W.'s shifting stories about the events of August 30, 2021. (See *ibid.* [evidence of a witness's fear of the defendant and his gang associates explained her "near-total recantation of her prior testimony and statements"].) " 'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.' " (*Id.* at p. 1080.)

Austin points to the prosecutor's shifting rationales for admitting the gang evidence. But we are not concerned with the prosecutor's reasoning, we

assess the court's ruling and the probative value versus prejudicial effect of the evidence that the court ultimately allowed into evidence. Austin makes no reasoned legal argument in any event based on the changing rationales advanced by the prosecutor.

Austin also argues that the People failed to prove he belonged to a criminal street gang within the meaning of section 186.22, subdivision (f)—that is, that Neighborhood Crips was an organized group "having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." He argues the People did not prove the element of criminal gang activity within the meaning of section 186.22, subdivision (e). According to Austin, though subdivision (e) of section 186.22 pertains to a defendant's guilt on substantive gang offenses and enhancements that "are not applicable" to this case, "the prosecution must still prove there *is* a gang." We may disregard the contention, which is made without reasoned legal argument or authority. (*People v. Sorden* (2021) 65 Cal.App.5th 582, 603 [absence of reasoned legal argument supported by citation to authority allows reviewing court to treat contention as forfeited]; *Siskiyou Hospital, Inc. v. County of Siskiyou* (2025) 109 Cal.App.5th 14, 39 [same].) It is meritless in any event. During his testimony, Detective Leahy referred to the Neighborhood Crips as a "criminal street gang" unique to San Diego and identified their "predominant [sets]" as West Coast and Neighborhood. He described them as a "very large, very active gang set in San Diego." He identified the gang symbols common to Neighborhood Crips. The record is unlike that in *People v. Huynh, supra*, 65 Cal.App.5th 969, in which no evidence established the defendant's organization was a criminal

25

street gang. (*Id*. at p. 982.) In our view, the prejudicial impact would have been greater if the People presented evidence that Neighborhood Crips members generally engaged in a pattern of criminal gang activity, so as to prove a substantive gang crime or gang enhancement not alleged in this case.

The tattoo evidence further tended to establish Austin's identification with the 4-1 Neighborhood Crips subset, which he denied at trial. It also helped to establish Austin's motive to shoot Williams in broad daylight while he slept in his car as retaliation for the murder of Carroll, Austin's close 4-1 associate. And the evidence concerning the Neighborhood Crips subsets gave meaning and context to Austin's statements to the holding cell inmate, "Boom, boom, boom, boom, boom, because it's a big 4-1/4-7 thing going on, but you from 4-1 like me." We note finally that some of the more provocative evidence Austin cites—the detective's identification of cliques such as Young Reckless Mafia, which he described as "really bad guys," and the Young Original Crips and his description of things "that benefit the gang" such as "making money, committing crimes, spray painting"—were elicited by defense counsel on cross examination.

Thus, we conclude the evidence was relevant and admissible. Allowing significant evidence about the Neighborhood Crips gang and Austin's gang affiliation was neither arbitrary, capricious, nor patently absurd. Nor did the evidence render Austin's trial fundamentally unfair. Motive and intent for Williams's shooting was crucial to the People's case. The People were entitled to place this seemingly random act, and Austin's incriminating statements, into context. This case was more than a defendant charged with a non-gang-related crime who happens to be a gang member as in *People v. Garcia, supra*, 107 Cal.App.5th 1040. The evidence went to show Austin's crime was committed *because* of the gang subset animosity, as well as

26

Austin's desire as a 4-1 member to avenge Carroll's death. Because the court did not abuse its discretion under state law, Austin's constitutional claims also fail. (*People v. Fuiava* (2012) 53 Cal.4th 622, 670.)

D. *Prejudice*

Even if we were to hold the trial court abused its discretion by admitting the testimony Austin complains of, he cannot show that he was prejudiced. "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Watson, supra*, 46 Cal.2d at p. 836.) Erroneous admission of evidence results in an unfair trial " ' "[o]nly if there are no permissible inferences the jury may draw from the evidence," ' " and " ' "[e]ven then, the evidence must 'be of such quality as necessarily prevents a fair trial.' " ' " (*People v. Thompson* (2022) 83 Cal.App.5th 69, 104.)

There is ample substantial evidence supporting Austin's convictions. Both S.J. and J.W. positively identified Austin as the shooter, his street name and the location of his home was mentioned by a bystander in the 911 call, and police tracked his phone to the vicinity of S.E.'s street and to the park. Austin made incriminating statements to the holding cell inmate that he "popped on" a person due to the "4-1/4-7 thing going on . . . ." The gang evidence here was not uniquely or extremely inflammatory as was the evidence regarding the gang's targeting of vulnerable elderly and children in *Chhoun*. (*People v. Chhoun, supra*, 11 Cal.5th at p. 33.) We agree with the People that it is not reasonably probable Austin would have obtained a better result had the court excluded the evidence.

## II. *Unauthorized Parole Revocation Fine*

The trial court imposed a $300 fine pursuant to section 1202.45, indicating it was suspended unless parole is revoked. Austin contends, and the People agree, we must strike this fine because he was sentenced to a term of life without possibility of parole. The People's concession is correct. A section 1202.45 parole revocation fine is unauthorized in cases where the defendant is sentenced to LWOP and there are no determinate terms. (*People v. Montes* (2021) 70 Cal.App.5th 35, 48-49; *People v. McInnis* (2021) 63 Cal.App.5th 853, 866-867; see *People v. Baker* (2021) 10 Cal.5th 1044, 1108 [parole revocation fine held applicable despite death sentence "because defendant was also sentenced to a determinate term"].) Although Austin did not object when the court imposed the fine, he is nevertheless entitled to the requested relief. An unauthorized sentence may be corrected at any time even if there was no objection in the trial court. (*People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1249, citing *In re Sheena K.* (2007) 40 Cal.4th 875, 886 & *People v. Smith* (2001) 24 Cal.4th 849, 854.)

## DISPOSITION

The judgment is modified to strike the $300 section 1202.45 parole revocation fine, and otherwise is affirmed.  The court is directed to issue an amended and corrected abstract of judgment reflecting removal of the fine and forward a certified copy to the Department of Corrections and Rehabilitation.


O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.

29